# UNITED STATES DISTRICT COURT

### NORTHERN _____ DISTRICT OF _____ ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **FILED** **05CR0255** |
| v. | |
| HOSSEIN ESFAHANI<br>3959 W. Arthur Ave.<br>Lincolnwood, Illinois | MAR 2 1 2005<br>Mar 21. 2005<br>**MICHAEL W. DOBBINS**<br>**CLERK, U.S. DISTRICT COURT** |

**CRIMINAL COMPLAINT**

CASE NUMBER: MAGISTRATE JUDGE KEYS

JUN 1 3 2005

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Beginning no later than October 26, 2001 and continuing to the present, in Cook County, in the Northern District of Illinois, and elsewhere, defendant did, (Track Statutory Language of Offense)

knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business, and, as part of that business, willfully violated, and willfully attempted to violate an orders and regulations issued under the International Emergency Economic Powers Act, Title 50, United States Code, §§ 1701 et seq, including, specifically, among others, Executive Orders 12959 and 13059, and the Iranian Transaction Regulations of Title 31, part 560 of the Code of Federal Regulations, including, specifically 31 C.F.R. § 506.206, by providing money transmitter services involving and related to the transmittal of funds to Iran.

in violation of Title 18, United States Code, Sections 1960 and 2 and Title 50, United States Code, Section 1705.

I further state that I am a  Special Agent, Immigration Customs Enforcement  and that this complaint is based on the following facts:
                                      OFFICIAL TITLE

### SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  _x_  Yes  _____  No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

| | | |
|---|---|---|
| __March 21, 2005_____ | at | __Chicago, Illinois_____ |
| Date | | City and State |
| __Hon. Arlander Keys, U.S. Magistrate Judge__ | | _____ |
| Name & Title of Judicial Officer | | Signature of Judicial Officer |

# AFFIDAVIT

STATE OF ILLINOIS

COUNTY OF COOK

Lisa Titus, being first duly sworn on oath, deposes and says:

1.  I am a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement (ICE), Chicago, Illinois having been employed with ICE since November 2001. Prior to that time, I was a student at Western Illinois University where I graduated with honors with a Criminal Justice Degree.

2.  My duties and responsibilities as a Special Agent with ICE have included conducting investigations relating to drug smuggling, money laundering and related financial crimes, the illegal exportation of weapons and high technology, the illegal exportation of commodities and money to embargoed countries, general smuggling, criminal fraud and the importation and distribution of child pornography.

3.  I have received training through the Federal Law Enforcement Training Center in the areas of illegal exports of goods and technology including the enforcement of the regulations pertaining to embargoes against certain designated countries. As an ICE Special Agent, I have participated in investigations of individuals suspected of violating the U.S. export control laws and regulations, as well as foreign embargo laws and regulations.

4.  All information contained in this Affidavit is based upon my personal knowledge, my conversations with various law enforcement officers and the review of evidence gathered during the course of this investigation. When I rely on statements made by others, such statements are related in part and in substance unless indicated. Because this Affidavit is made for the limited purpose of obtaining a search warrant, I have not set forth each and every fact obtained during the

course of the investigation.

5.     This Affidavit is made in support of a criminal complaint alleging that beginning no later than October 26, 2001 and continuing to the present, Hossein Esfahani has (1) knowingly conducted, controlled, managed, supervised, directed, and owned all or part of an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960 and 2 and, (2) as part of that business, willfully violated, and willfully attempted to violate an orders and regulations issued under the International Emergency Economic Powers Act, Title 50, United States Code, §§ 1701 et seq, including, specifically, among others, Executive Orders 12959 and 13059, and the Iranian Transaction Regulations of Title 31, part 560 of the Code of Federal Regulations, including, specifically 31 C.F.R. § 506.206, by providing money transmitter services involving and related to the transmittal of funds to Iran, in violation of Title 50, United States Code, Section 1705.

6.     As described more fully below, the investigation to date reveals that as far back as 1999 and continuing to the present, Esfahani has operated an unlicensed money transmitting business from, among other places, his 3959 West Arthur, Lincolnwood, Illinois residence, in violation of Title 18, United States Code, Section 1960. As part of the operation of his unlicensed money transmitting business, Esfahani has engaged in and facilitated the unlicensed transmittal of funds from the United States to Iran, in violation of the International Economic Emergency Powers Act, Title 50, United States Code, Section 1705. In brief summary, and as set forth in greater detail below, analysis of bank records made available to the investigation to date covering a period beginning in 1999 running into 2003 has revealed that Esfahani transmitted in excess of $3.75 million to domestic and international locales from one or more bank accounts in the United States, including, currently, Harris Bank account # 8501720404 held in the name of Hossein M. Esfahani Exchange. Account records reflect that since 1999 the vast majority of Esfahani's unlicensed money

2

transmittals have been directed to money exchanges located in Dubai, United Arab Emirates. Those money exchanges, in turn, convert the wired funds to Iranian currency and then direct the funds to a specified location in Iran, including Esfahan, Iran, (the target's place of origin), from where the funds are directed to recipients throughout Iran as specified by the sending party through Esfahani.

Relevant Legal Provisions

Unlicensed Money Transmitter Business, 18 U.S.C. § 1960

7.      Title 18, United States Code, Section 1960, prohibits the operation of an "illegal money transmitting business," defined in part as one which "is intentionally operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law" or "fails to comply with the money transmitting business registration requirements under section 5330 of Title 31, United States Code, or regulations prescribed under such section."

8.      In Illinois, the Transmitter of Money Act, 205 Ill. Comp. Stat. 657/1 et seq. prohibits any person from engaging in the business of transmitting money without a license from the State of Illinois. 205 Ill. Comp. Stat. 657/10. To do so is a felony offense under the Act. 205 Ill. Comp. Stat. 657/90(h).

9.      Effective January 1, 2002, there has existed under federal law and related regulatory provisions an independent obligation for any person who owns or controls a money transmitting business to register the business with the Secretary of the Treasury. 31 U.S.C. § 5330; 31 C.F.R., Part 103.

IEEPA Provisions, 50 U.S.C. §§ 1701 <em>et seq.</em>

10.      IEEPA provides authority to the President of the United States to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United

3

States, if the President declares a national emergency with respect to such threat. 50 U.S.C. § 1701. Any individual or officer, director, or agent of any corporation who knowingly participates in a violation of any license, order, or regulation issued under authority of the IEEPA is subject to a fine of up to $50,000 and a prison term of up to ten years. 50 U.S.C. § 1705.

<u>Embargo on Trade or Exchange of Services with Iran</u>

11.     As a result of Iran's support for international terrorism and its aggressive actions against non-belligerent shipping in the Persian Gulf, and pursuant to executive authority derived from, among other places, IEEPA, Iran is an embargoed country with which business activities generally are proscribed unless within excepted categories or licensed through the Treasury Department office of Foreign Asset Control ("OFAC").

12.     As a result of Iranian sponsorship of international terrorism and Iran's pursuit of weapons of mass destruction, the President issued Executive Order 12957, effective March 16, 1995, prohibiting United States involvement with or participation in petroleum development in Iran. On May 6, 1995, he signed Executive Order 12959, pursuant to among other laws, the International Emergency Economic Powers Act ("IEEPA), substantially tightening sanctions against Iran.

13.     On August 19, 1997, the President signed Executive Order 13059 clarifying Executive Orders 12957 and 12959 and confirming that all trade and investment activities with Iran by U.S. persons, wherever located, are prohibited.[1]

14.     The trade restrictions are implemented through the Iranian Transaction Regulations

---

[1]     The trade prohibitions were eased in 2000 for the limited purpose of allowing United States persons to purchase and import carpets and food products such as dried fruits, nuts, and caviar from Iran. The trade embargo was further eased for the added limited purpose of permitting humanitarian assistance to the victims of a massive earthquake centered in Bam, Iran in December 2003. Both modifications to the otherwise general embargo were implemented through amendments to the ITR.

(ITR) codified at Title 31, Part 560 of the Code of Federal Regulations, which provide in relevant part:

"Prohibited trade-related transaction with Iran, goods, technology, or services"

    (a)    Except as otherwise authorized pursuant to this part, and notwithstanding any contract entered into or any license or permit granted prior to May 7, 1995, no United States person, wherever located may engage in any transaction or dealing in or related to:

        (1)    Goods or services of Iranian origin or owned or controlled by the Government of Iran; or

        (2)    Goods, technology or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran; or

    (b)    For purposes or paragraph (a) of this section, the term transaction or dealing with includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing.

31 C.F.R. Part 560.206

## Probable Cause

15.    In July 2003, your affiant received information from a confidential source (CS1) stating that an individual in the Chicago area, hereinafter referred to as Individual A, was involved in collecting money for transmittal to Iran. CS1 stated that Individual A conducted this activity out of his grocery store in Chicago. A Lexis Nexus database search revealed that Individual A operated and owned PARS Persian Store, 5260 N. Clark, Chicago, Illinois.

16.    A database query by the Illinois Department of Financial and Professional Regulations (IDFPR) revealed that neither Individual A nor his business, PARS Persian Store, was licensed in the State of Illinois as a money remitter or was otherwise identified as an agent of a licensed money transmitter. A corresponding federal financial database query performed in September 2003 reflected that Individual A did not have a license to send money to Iran.

17.    On October 26, 2004, a second confidential source (CS2), who has no known

criminal record and was not promised any benefit for his/her assistance, at the direction of federal law enforcement agents entered PARS Persian store and conducted a video and audio taped conversation with Individual A. In the recorded exchange, CS2 stated that he/she was from Iran and wanted to send money to Shiraz, Iran. Individual A gave CS2 a phone number – (312) 671-5464-- which Individual A said belonged to a man named Hossein Esfahani. Individual A indicated, in essence, that Esfahani handles the actual transmittal to Iran of funds taken in by Individual A.

| | |
|---|---|
| Individual A: | Yeah, he is the only person with whom you can work. You call him, if he wants, you bring your money and leave it here and he picks it up from here. If not, you have some other arrangements, you take it and give it to him. But from what I know about him, everybody is working with him regularly. |
| CS2: | Okay. |
| Individual A: | Do you understand? |
| CS2: | Yeah. |
| Individual A: | That is someone who has been in this business for ten years, fifteen years and all the Iranians here are doing business with him. |
| CS2: | I can leave the money here and then he takes it from you? |
| Individual A: | He comes and takes it. Yes. |

18.     Esfahani was identified through telephone records and other law enforcement and public information databases as Hossein M. Esfahani, residing at 3959 W. Arthur, Lincolnwood, Illinois. Review of phone company records obtained through the investigation revealed that (312) 671-5464 is an active US Cellular number subscribed in the name of Joeseph Esfahani, 3959 W. Arthur, Lincolnwood, Illinois 60712.

19.     Based on inquiry to federal and state licensing and registration authorities, as of March 15, 2005, Esfahani has at no time been (1) licensed to send money to Iran according to the Office of Foreign Assets Control (OFAC), the originating authority for such licensing; (2) licensed

with the state of Illinois as a money remitter, according to the Illinois Department of Financial and Professional Regulations, the state registration authority for the operation of such a business or service, and; (3) registered as a money remitter with the United States either through the Department of Treasury or the Financial Crimes Enforcement Network (FINCEN), according to a database inquiry conducted by FINCEN and its Treasury Department liaison.

20.     On October 26, 2004, CS2 placed a consensually recorded telephone call to Esfahani at the 312-671-5464 number provided to CS2 by Individual A.   During the call, which was conducted in the Farsi language, (as were all other consensually recorded calls detailed in this affidavit), Esfahani acknowledged that he was in the business of sending money to Iran, and would be able to conduct currency transmittals to Iran for CS2. Esfahani explained that CS2 could send Esfahani the money to be transmitted in one of two ways: either by mailing a check to Esfahani; or by leaving a check or cash for Esfahani at PARS Persian Store.  He further explained that if CS2 provided cash, there would be no receipt for the transaction, while a check, once processed would constitute its own form of receipt.   Esfahani also represented that the transmittal would take approximately two to three days to reach most specified destinations in Iran.

| Esfahani: | With me, what do you, what business do you have with me? You want to send money to Iran? |
|---|---|
| CS2: | Yes. Yes. |
| Esfahani: | You, dear, can send money to Iran in two ways, either mail me a check or take a check and leave it at Pars Store. Do which ever of these two ways you like. |
| CS2: | Okay Okay. |
| Esfahani: | Either mail me a check, or drop off a check for me at Pars Store. |
| CS2: | Pars Store, Okay. |

7

| | |
|---|---|
| CS2: | Don't you take cash? Because I don't have check. |
| Esfahani: | No, No dear, if you want I would take cash, but I wouldn't give you a receipt. No. |
| Esfahani: | How much do you want to send to Iran, dear? |
| CS2: | I, for the first time, for the first time, because I want, I want to send it quickly, 250. But later- |
| Esfahani: | 25, 250 dollars, okay dear, no problem. Go to Pars store dear. No problem. |
| CS2: | What information do you want me to give to Mr. Pars? |
| Esfahani: | A telephone number, dear. Put the name and telephone number plus the money in the envelope. |
| CS2: | Okay. |
| Esfahani: | Close the envelope and write on it, "Keef [ph.] Currency Exchange" and give it to PARS. |

21.     Later that day, CS2 engaged Esfahani in a second consensually recorded phone conversation. On this occasion, Esfahani answered "Keef [ph.] Currency Exchange." During the call, Esfahani additionally explained to CS2 that the role of PARS Persian Store was solely to take envelopes from senders like CS2 and give them to Esfahani.

22.     Later that same day, CS2 returned to PARS Persian Store and gave Individual A $225.00, United States Currency. The interchange between the two was audio recorded. At Individual A's instruction, CS2 placed the money in a white envelope on which he wrote the name and telephone number of the recipient in Shiraz, Iran (referred to hereinafter as recipient or Individual B), as well as CS2's telephone number.

23.     On October 28, 2004, in another consensually recorded call with Esfahani, CS2 inquired if Esfahani had received the money that CS2 had left at PARS Persian for transmittal to Iran. Esfahani stated that he had received the money and it would be delivered soon in Iran.

8

| | |
|---|---|
| CS2: | Mr. Esfahani, I wanted to see whether you received my envelope. You receive it? |
| Esfahani: | Okay what is your envelope dear? |
| CS2: | I gave the envelope to Mr. Pars Store. |
| Esfahani: | Yes, what is the name of the recipient in Iran sir? |
| CS2: | [Individual B]. |
| Esfahani: | [Individual B], how much was it? |
| CS2: | 225 dollars. |
| Esfahani: | Yes dear. I got it. |

24.     During the phone call, Esfahani additionally confirmed his ability to send money to other parts of the world. Esfahani also indicated that he had a license for acting as a money transmitter.

25.     On October 31, 2004, CS2 stated to your affiant that the recipient in Iran had received a phone call in Iran from a male identifying himself as Abrahim Esfahani who called from cellular telephone number 913-113-9177, which subsequently was confirmed to be an Iranian cellphone exchange. As related by CS2, Abrahim Esfahani requested that the Iranian recipient provide him with his/her bank account information in Iran, so that he, Abrahim Esfahani, could deposit the money directly into the recipient's Iranian bank account.

26.     On November 4, 2004, CS2 stated to your affiant that he/she had spoken to the recipient in Iran, and that the recipient had received the funds into his/her account in Shiraz, Iran. The recipient explained to CS2 that when he/she inquired at his Shiraz, Iran bank about the manner by which the transmitted funds came into his/her account, he/she was informed that the money was transferred by means of an ATM transaction originating in Esfahan. The recipient further related

his/her understanding from Abrahim Esfahani was that the money was deposited in an ATM in Esfahan, Iran, and then was immediately available in his/her account in Shiraz, Iran.

27. On November 9, 2004, CS2 returned to PARS Persian store and gave to Individual A an additional $250.00 in cash for transmittal to Iran by Esfahani. On the same date, CS2 placed a consensually recorded telephone call to Esfahani. After CS2 informed Esfahani that he/she had dropped off $250.00 at PARS Persian Store, Esfahani and CS2 had the following exchange regarding the rates charged by Esfahani for conducting money transmittals to Iran.

CS2: Mr. Esfahani, I have a question.

Esfahani: Dear?

CS2: If we want to send a few thousand dollars, how much percentage do you charge as your commission?

Esfahani: Percentage- We don't charge a percentage, we give you a price and deliver with a price for you.

CS2: Aha, for instance now, now for instance I gave you 250, what price for instance?

Esfahani: 830 Tomans for 250 dollars.[2]

CS2: 830 Tomans.

Esfahani: The higher the amount, we give a better price."

CS2: Aha, you charge 830 Tomans, buying it.

Esfahani: It does not have a fixed rate, dear. There is no specified and determined rate. The rate is continually changing. At the present, we deliver 830 in Iran for your 250 dollars.

CS2: 830. Aha, I just wanted to see, for instance, how should I pay your commission? For instance, do I pay your commission separately here? Because–

---

[2] A Tomans is an Iranian unit of currency.

Esfahani:     Our commission is included, dear.

. . . . . .

CS2:          The amount doesn't make a difference?

Esfahani:     Yes, if the amount is more, we give you a better price.

28.     On November 24, 2004, CS2 stated to your affiant that he/she received by telephone confirmation from the recipient that the money transferred on November 9, 2004 was successfully received into the recipient's account in Shiraz, Iran.

29.     On December 7, 2004, CS2 returned to PARS Persian Store and dropped off another $250.00 with Individual A for Esfahani to transmit to Iran. On the same date, CS2 placed a consensually recorded telephone call to Esfahani, during which the two discussed the amount of time it would take for the newly provided funds to reach the recipient in Iran, as well as the conversion rate from American currency to Iranian currency. On December 14, 2004, CS2 reported to your affiant that he/she had spoken by telephone with the recipient who related that he/she had successfully received the December 7, 2005 transmittal funds into his bank account in Shiraz, Iran.

30.     On January 7, 2005, in attempting to make telephonic contact with Esfahani, CS2 received the following pre-recorded message from Esfahani.

Esfahani:     (In English) Thank you for calling, please leave a message and somebody will return your call as soon as possible.

              (In Farsi) With greetings and thanks for calling King, trusted expert with more than twenty years of experience in matters of sending and receiving money from Iran. Please leave a message and we will contact you as soon as possible. Please mention your telephone number in addition to the area code in your message. We thank you.

31.     On January 8, 2005, CS2 placed a consensually recorded call to Esfahani. CS2 told Esfahani that he/she wished to send money to Iran, but was out of town and therefore would not be

able to drop off any money at PARS Persian Store. CS2 inquired about sending a check to Esfahani's business location. Esfahani directed CS2 to send a check to his business address located at 3959 W. Arthur, Lincolnwood, Illinois.

32.     On January 10, 2005, your affiant mailed a $250 check payable to Hossein Esfahani in a white envelope addressed to Hossein Esfahani, 3959 W. Arthur, Lincolnwood, Illinois 60712. The check was mailed with with a white sheet of paper, on which was handwritten the name of the recipient to whom the funds were to be transmitted, the recipient's Iran telephone number, the recipient's location, specifically Shiraz, Iran.

33.     On January 20, 2005, CS2 informed your affiant that the designated recipient of the funds from the check mailed to Esfahani on January 10, 2005 had received the money in Shiraz, Iran. The investigation subsequently recovered the canceled check sent to Esfahani for the transmittal. The back of the check was endorsed by Esfahani, with the signature appearing to match the signature on Esfahani's Illinois driver's license. Additionally, the check was deposited into Esfahani's Harris Bank account. In the bottom left memo portion of the check, Esfahani hand wrote in "$ Exchange". A review of security video stills subsequently secured from the Lincolnwood branch of Harris Bank reflect that Esfahani personally deposited the check into his account on January 19, 2005.

34.     On February 4, 2005, your affiant and a representative of the IDFPR conducted an undercover outreach to Esfahani at his 3959 W. Arthur, Lincolnwood, Illinois residence. The resulting meeting was videotaped with audio. The affiant and the IDFPR representative explained to Esfahani that they were participating in an outreach program that provided money remitters with the rules and regulations for engaging in such activities in the State of Illinois. Esfahani specifically was provided with a packet of information explaining that a wire remitter business in Illinois needed

12

to be licensed in order to transmit currency. Esfahani was also provided with a printout of information from the official OFAC website specifically stating that money remitters, are not permitted to send money to certain countries, including specifically, Iran. The printout also indicated that if a money remitter does participate in transactions to countries listed on the OFAC list, they are liable to be prosecuted under 50 USC 1701-1705. Esfahani read the printout in front of your affiant and the IDFPR representative. Your affiant, in conjunction with the IDFPR representative read aloud relevant portions of the OFAC printout, including the portion regarding the prohibition on transmittals to Iran. During this meeting, Esfahani did not state either that he had a money transmitter license or that he was an agent for a licensed money transmitter, or that he had a license that would have permitted him to conduct business relating to Iran. Esfahani, who spoke and is known to speak fluent English, stated that he understood the information provided by your affiant and the IDFPR representative and that he had no questions.

35. On February 4, 2005, subsequent to the undercover outreach conducted at Esfahani's residence, CS2 returned to PARS Persian Store and left $250.00 in cash for Esfahani to pick up and transmit to Iran.

36. On February 9, 2005, your affiant mailed to Esfahani at his 3959 W. Arthur, Lincolnwood home a second $250 check for transmittal of funds to Iran. This check was made out to Hossein Esfahani and was mailed with a white sheet of paper on which was handwritten the name of the recipient to whom the funds were to be transmitted, the recipient's Iran telephone number, the recipient's location, specifically Shiraz, contact information of CS2, and instructions relating to an intermediate step required to complete the transmittal.

37. On February, 10, 2005, CS2 placed a telephone call to Esfahani. CS2 stated to Esfahani that he/she had left $250.00 for him at PARS Persian Store. In addition to that $250.00,

CS2 also indicated that he/she had mailed Esfahani another check for the amount of $250.00. CS2 instructed Esfahani that when he receives both payments Esfahani should contact his business partner in Iran to inform him that the recipient will be using a new Iranian bank account. CS2 requested that Esfahani's partner in Iran obtain the new account information immediately, to insure that the money will be successfully transferred, and received by the recipient. Esfahani stated that it was not a problem and he would take care of it.

38.     On February 11, 2005, Esfahani left a voicemail message on the consensually monitored phone of CS2 stating that he wanted to speak with CS2 about his transactions.

39.     On February 14, 2004, CS2 placed a consensually recorded call to Esfahani and stated that he/she had received Esfahani's voice mail message. Esfahani responded that he had received two $250 installments for transmittal to CS2's recipient in Iran and that he wished to confirm that both installments were in fact from CS2. CS2 confirmed that both payments had come from him/her and, more specifically that he/she had dropped off $250.00 at Pars Persian Store and mailed Esfahani a check for the additional $250.00. Esfahani stated that he understood and would send the money through to Iran that day or the day after.

40.     On February 17, 2005, CS2 attempted a recorded telephone call to Iran to verify that the recipient had received both $250.00 payments transmitted through ESFAHANI. The recipient was unavailable at this time.

41.     On February 19, 2005, CS2 again placed a recorded telephone call to Iran to verify that the recipient had received both payments of $250.00 transmitted through ESFAHANI.

CS2:          Listen, I have a question.

Recipient:    Dear?

CS2:          CS2 has sent you $500.00 dollars.

14

Recipient:    So.

CS2:    Have you received it now or you haven't received it?

Recipient:    Yeah, yeah.

CS2:    How much have you received?

Recipient:    Uh, two, it was two times 205.

CS2:    Two times, $250.00 dollars, right?

Recipient:    Yeah, two times 250."

CS2:    Ok, so until now, any money that I have sent you, have you received all of it in total or not?

Recipient:    Yeah, I have received it all.

42.    The investigation subsequently recovered the $250 check mailed to Esfahani on February 10, 2005. As with the prior undercover check, the check had been endorsed on the back by Hossein Esfahani in a signature that appeared to match the signature on Esfahani's Illinois driver's license. Additionally, the check had been deposited into and cleared through Esfahani's Harris Bank account, # 8501720404, on or about February 15, 2005. A review of security video for a Harris Bank branch in Lincolnwood, Illinois revealed that Esfahani personally deposited the check into his account on February 14, 2005.

### Trash Recovered from 3959 W. Arthur, Lincolnwood, Illinois

43.    On January 24, 2005, your affiant retrieved trash put out for collection on the public way outside Esfahani's 3959 W. Arthur residence. The trash included a number of documents relating to Esfahani's operation of an unlicensed money transmitting business that further involves the transmittal of funds to Iran. Among the items recovered was an envelope with Farsi handwriting on the front stating "Mr. Asfehani that account no # is 74317 Bank Melli Branch Airport, Tehran

15

code 1240, Hamik Khachiki." Public and financial database search revealed that Bank Melli is a bank based in Iran. Teheran is the capital of Iran.

44.     Also found in the trash was a fax transmission report for a fax sent on January 22, 2005 at 10:35 AM to phone number 011983112233026. The document including what appear to be handwritten numerical notations and calculations, possibly of currency amounts. Analysis of the originating fax number on the fax transmission line revealed it to be an Iranian number from the Isfahan, Iran exchange. Additionally, the trash included torn and discarded checks or items relating to the Harris Bank account from which Esfahani conducts his unlicensed money transmitter activities.

### Unlicensed Money Transmitter Mailings to 3959 W. Arthur

45.     As part of the investigation, your affiant received information from the United States Postal Inspection Service regarding mailings to Esfahani's 3959 W. Arthur address during portions of January and February 2005. The investigation obtained information appearing solely on the exterior of envelopes and parcels mailed and delivered to Esfahani's 3959 W. Arthur residence, including, specifically, addressor and addressee information. Among the mailed items were numerous envelopes addressed to variants of "Hossein Esfahani Exchange" and "Hossein Esfahani," with the variants corresponding generally to those observed on checks deposited by Esfahani into his money transmitter business account at Harris Bank. Additionally, the return address or addressor information on these mailings reflected that numerous mailings were sent to Esfahani or Hossein Esfahani Exchange by individuals or entities with Iranian names, from locations around the United States. These characteristics likewise generally correspond to the originating parties appearing on checks Esfahani deposited into his money transmitter account at Harris Bank. I believe that this information, in conjunction with the evidence of Esfahani's methods and means in conducting his

16

unlicensed money transmitter business through the undercover transactions detailed above, reflects that Esfahani conducts his unlicensed money transmitter business from and receives and maintains records relating to that business at his 3959 W. Arthur Lincolnwood, Illinois residence.

Analysis of Harris Bank Account Used to<br>
<u>Conduct Unlicensed Money Transmitter Business</u>

46.     Review of bank records for Harris Bank Account # 8501720404 reflect that it is held in the name of Hossein M. Esfahani Exchange, with a mailing address of 3959 W. Arthur, Lincolnwood, Illinois. Hossein Esfahani is the only signatory on the account. Analysis of activity on the account reflects the following:

<u>Deposit Activity on Harris Bank Account # 8501720404</u>

47.     For the period of October 2001 to the present Esfahani's deposits into the above account typically ranged from approximately $100,000 to $300,000 per month. Deposits generally were comprised of a combination of cash (typically in the thousands of dollars) and various types of checks, official bank drafts and/or money orders. (The records reflect Pars Persian Store as regular source of funds Esfahani has deposited not only as a source of cash, but also as the originator of a steady stream of checks made payable to Esfahani in irregular amounts, such as would be consistent with a practice of Pars itself deposit transmitter customer cash into its own account and then transferring it to Esfahani in the form of a check drawn against the Pars account.) The respective deposits that included the two undercover operation checks mailed to Esfahani for transmittal of funds to Iran exemplify the nature of deposits into the Harris Bank account.

48.     Esfahani deposited the first undercover check of $250 on January 19, 2005 as part of a larger deposit totaling $107,740. Of that sum, $4,750 was in the form of cash. The remainder was comprised of a combination of personal checks and official cashier's checks from various

17

locations around the United States. Among the deposited checks were a handwritten check from a Persian Market in St. Louis Missouri, a handwritten $450 check from a personal bank account in Charlotte, North Carolina, a $5,000 cashier's check issued by a bank in Waterbury Connecticut, a $5,000 cashier's check issued by Bank One in Illinois and an $85,000 cashier's check issued by First Midwest Bank. The checks are all made payable to some variant of either "Hossein Esfahani" or "Hossein Esfahani Exchange." They also almost invariably reflect that they were executed and sent to Esfahani by people with an Iranian surnames. In addition, some checks contain on the memo line handwritten instructional or facilitating transmittal references such as an Iranian telephone number.

49.     The second undercover check for $250 was deposited by Esfahani on February 14, 2005, as part of a total deposit of $5,175. The deposit was comprised of $2,000 and checks of $1,000, $500, $175, $600 and $300 each drawn from a personal account held in the names of individuals with Iranian or Middle Eastern surnames living in, among other places, Chicago, Naperville and Rockford, in Illinois, and as far away as California.

<u>Withdrawal of Funds from Harris Bank Account # 8501720404</u>

50.     Review of Harris Bank records reflects that withdrawals from the account generally fall into one of two broad categories: (1) payment of Esfahani's personal expenses or expenses for his own business activities, and (2) wire transfers to foreign financial institutions consistent with Esfahani's operation of an unlicensed international money transmitter business.

<u>Outbound Wire Transfers</u>

51.     The largest category of withdrawals from the account is outgoing wire transfers. Analysis of bank records made available to the investigation to date reflect a total of approximately $3.75 million in outbound wire transfers from in or about August 1999 to October 2003 alone. Of those outgoing wires, more than $3.1 million was directed by Esfahani to either Al Azhar Exhange

18

or Al Nafees Money Exchange at their respective bank accounts in Dubai, U.A.E. More specifically, for the period September 2001 through November 2002, Esfahani directed approximately 47 wire transfers totaling approximately $1,538,000 to the Al Azhar account at Emirates Bank in Dubai. The wires are transmitted only on the last day of each month during the analyzed period. From August 1999 through October 2003, Esfahani directed approximately 38 wire transfers to the Fav Habib Bank, Dubai account of Al Nafees Money Exchange.[3] The wire transfers totaled approximately $1,617,000 and, as is the case with the Al Azhar wire transfers, they occur only on the last day of the month, with multiple wire transfers occurring on each such day.

52.     The investigation has obtained information regarding the two Dubai exchanges reflecting them to be engaged in the provision of money transmitter and transfer services in an intermediary capacity between parties in Iran and the United States. Information obtained from other federal money transmitter investigations reflect that Al Azhar in Dubai has served as an intermediary for the wire transfer of funds from Iran to accounts in the United States. The second money exchange, Al Nafees Exchanges, LLC, has been revealed in other federal criminal investigations as serving a similar intermediary function for money transmittals between the United States and Iran. More specifically, the owner of an unlicensed money remitter business in the District of Maryland has disclosed to authorities that he utilized Al Nafees to transfer funds from the United States to Iran. Specifically, the unlicensed transmitter stated that he wire transferred dollars from an account in the United States to Al Nafees at its bank in Dubai. Al Nafees then converted the funds to Iranian currency and then redirected the converted currency to locations in

---

[3]     The investigation has yet to receive wire remittance notices for portions of 2000 and much of 2001. Accordingly, the figures provided represent the total outbound wire activity to Al Nafees Exchange solely for the periods August through September 1999, February through April 2000, and November 2002 through October 2003.

Iran as specified by the originating party in the United States.

53.    The remaining outgoing wires from Esfahani's Harris Bank account were directed to banks and institutions in, among other places, London, England, Canada, China, Indonesia. The bank records also reveal outbound wire transfers to various locations around the United States, including, New York, New Jersey, San Francisco, Los Angeles, Philadelphia and Washington, D.C.

Payment of Personal Expenses From Harris Bank Money Transmitter Account

54.    The second general category of outflows from Esfahani are checks or transfers for the payment of personal and personal business expenses.  Most prominent in this respect are mortgage payments for three real properties

55.    The Harris Bank money transmitter account records reflect that beginning in January, 2003 and continuing to the present, Esfahani executed a check payable to Washington Mutual in amounts ranging from approximately $4,000 to $4,300.  A review of mortgage and  insurance company records reflect that the Harris Bank checks correspond to and were credited against Esfahani's mortgage obligations for his residence at 3959 W. Arthur.  Those obligations arise from a three successive mortgage and mortgage refinance loans for the property issued to Esfahani by Washington Mutual.[4]  The current mortgage loan for the property was issued by Washington Mutual in 2004 for approximately $650,000.  Esfahani has made all of the monthly payments for the successive mortgage loans from the Harris Bank money transmitter account.

56.    The review of the Harris Bank money transmitter account records similarly reflects that beginning in February 2003 and continuing to the present, Esfahani has executed a check each month against that account, made payable to Washington Mutual to meet a mortgage loan obligation

---

[4]        The three successive loans are Washington Mutual loan #0615833354, #0646249565, and #0672100450.

for Washington Mutual loan # 0604543066. Mortgage and insurance company records reflect that this loan corresponds to a Washington Mutual Bank mortgage loan to Esfahani for real property he owns 205 Batavia Lane, Hoffman Estates, Illinois. Review of the Harris Bank and Washington Mutual records reflect that Esfahani has made all of the monthly payments for this mortgage loan from the Harris Bank money transmitter account.

57. Bank record analysis further reflect that in or about April 2003, Esfahani (and his wife) obtained financing from Harris Bank for his purchase and maintenance of property commonly known as 870-890 Roselle Road, Hoffman Estates, Illinois. Harris Bank records further reflect that Esfahani has made substantial payments relating to his ownership, financing and maintenance of the Roselle Road directly from the Harris Bank account through which he has conducted his unlicensed money transmitting business activities, including his unlicensed transmission of funds to Iran. The investigation has not revealed any legitimate streams of income sufficient to cover the purchase, financing and maintenance of that property.

### Additional Esfahani Statements Acknowledging Operation of Unlicensed Money Transmitter Business Sending Funds to Iran.

58. As described in greater detail below, Esfahani has, in various unrelated contexts, represented himself to be engaged in the business of transmitting money, (including to Iran) and further represented his business address to be 3959 W. Arthur Ave., Lincolnwood, Illinois.

### 2003 Mexico-U.S. Border Stop

59. On March 31, 2003, Esfahani was the subject of a border re-entry interview by two United States Customs Special Agents. At the time, Esfahani was making re-entry to the United States from Mexico at a California point of entry. In response to a query from the interviewing agents, Esfahani stated that he operated a side business in which he makes currency transfers for

21

people in Iran, using "King Exchange" as the business name for his currency transfer operation. Esfahani stated that he was not licensed to conduct these transactions. When asked if he was familiar with term "hawala," Esfahani laughed and indicated that this term described his currency transfer activities.[5]

### 2002 Mortgage Application for Property in New Lenox

60.     In February 2003, Esfahani submitted an application to Harris Bank as a co-applicant with long-time associate Amir Hosseini for a mortgage loan of approximately $290,763 on real property located in New Lenox, Illinois. The loan was approved and disbursed by Harris on the basis of the materials submitted by Esfahani. At the time of the closing in April 2003, Esfahani paid the closing costs and fees with a check he wrote off of his Harris bank money transmitter account. As part of his application for the loan, Esfahani (and his spouse) tendered to Harris Bank a personal statement they signed and dated on February 15, 2003. On that form, Esfahani stated his employer to be "King Exchange." He further stated the business address of King Exchange to be 3959 W. Arthur Ave., Lincolnwood, Illinois. Esfahani also represented that he was the "Owner-President"

---

[5]     A hawala is an alternative or parallel banking type remittance system that operates outside of conventional banking or financial channels. The classic hawala operates on the basis of a trust relationship between two networked money transmitters or hawaladars. An individual wishing to make a hawala transmission of funds brings money to a local hawaladar and instructs the hawaladar on where and to whom the money must be sent. The local hawaladar then would contact a hawaladar in the locale where the funds must be transmitted and provides the necessary details to effectuate the transfer at the recipient end. The transaction exists on the books of both hawaladars and is often offset by separate transactions conducted in reverse. To the extent the transmissions between the hawaldars are not offset, the balance may be cleared by an occasional wiring of actual funds. Esfahani's Harris Bank account records show outbound wire transfers to Dubai occurring only on the last day of each month, even though, as reflected in the undercover operation, transmittal of funds to Iran from Chicago are completed in a matter of days. In order for this to happen, Esfahani must have one or more associates in Iran who are, in effect, fronting money for Esfahani, with a clearing of accounts occurring through the end of the month wire transfers.

of King Exchange, and that he had been so for 15 years.[6] In further support of the application, Esfahani submitted what purports to be a copy of his 2001 federal tax return. In the return, Esfahani claimed business income of $95,088. In the accompanying Schedule C (Profit or Loss from Business) for the IRS Form 1040, Esfahani stated his business to be "Financial Services Remittance" and gave as his business address 3959 W. Arthur, Lincolnwood, Illinois.

### 2003 Mortgage Application for 3959 W. Arthur

61.    According to a search of public databases, Esfahani has owned and lived in the 3959 W. Arthur since at least as far back as 1998. Esfahani financed the house through a series of mortgage loans from Washington Mutual Bank. In support of the various applications and to demonstrate sufficient income to support such a note, Esfahani tendered to Washington Mutual, among other things, what purported to be a copy of his 2000 and 2001 federal tax returns. In the tendered returns, Esfahani represented his employment and primary source of income to be the operation of a money and financial services exchange business that he represented that he operated from 3959 W. Arthur, Lincolnwood, Illinois. In related application forms Esfahani made similar representations regarding the operation of the business that he referred to as Hossein M. Esfahani Exchange, which he further represented as operating as far back as the mid 1980's.

---

[6]    Esfahani's spouse executed the personal statement as a co-applicant. She represented herself as having no employer and that she was a housewife. The accompanying 2001 tax return correspondingly did not reflect her to have any employment or employment income. Based on this information, it therefore appears that Esfahani is the sole source income earner for the family and that all purchased assets that he and his wife own have been purchased with the proceeds of Esfahani's business activities.

## Conclusion

62.     Based on the foregoing, there is probable cause to believe that beginning no later than October 26, 2001 and continuing to the present, Hossein Esfahani has (1) knowingly conducted, controlled, managed, supervised, directed, and owned all or part of an unlicensed money transmitting business, in violation of Title 18, United States Code, Section 1960 and 2 and, (2) as part of that business, willfully violated, and willfully attempted to violate an orders and regulations issued under the International Emergency Economic Powers Act, Title 50, United States Code, §§ 1701 et seq, including, specifically, among others, Executive Orders 12959 and 13059, and the Iranian Transaction Regulations of Title 31, part 560 of the Code of Federal Regulations, including, specifically 31 C.F.R. § 506.206, by providing money transmitter services involving and related to the transmittal of funds to Iran, in violation of Title 50, United States Code, Section 1705.


Lisa Titus
Special Agent
Immigration and Customs Enforcement


SUBSCRIBED AND SWORN TO BEFORE ME
THIS 21 st DAY OF March, 2005

Arlander Keys
U.S. Magistrate Judge

24